The Honorable Tiffany M. Cartwright

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

Plaintiff

v.

ROSHARD ANDREW CARTY,

Defendant.

NO. CR24-5250-TMC

**UNITED STATES' SENTENCING MEMORANDUM**

## I.     INTRODUCTION

Roshard Andrew Carty perpetuated a long-running lottery scam designed to steal hundreds of thousands of dollars from vulnerable senior citizens. He contacted his victims out of the blue and told them—falsely—that they won millions of dollars in the lottery. Then, over the course of years, he manipulated them into sending their life savings to strangers around the country.

Carty deployed this scam on Victim 1, a Washington resident. Carty falsely told Victim 1 that she won the lottery, but she needed to pay taxes and fees to claim her winnings. Over the next several years Carty directed Victim 1 to send hundreds of thousands of dollars to various money couriers around the United States and in Jamaica. Carty left Victim 1 destitute and spent the proceeds on a lavish life in his home country

United States' Sentencing Memorandum - 1
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of Jamaica. For this conduct, the government recommends the Court sentence Carty to 41 months in prison and order him to pay $601,005 in restitution.

## II.    BACKGROUND

### A.    Carty posed as "James Preston" and cold-called Victim 1.

Carty first contacted Victim 1 out of the blue August 2020. Dkt. No. 33 (Plea Agreement) ¶ 8(b). Using the alias "James Preston," Carty told Victim 1 that he worked for Publisher's Clearinghouse and that she won $22 million and a car in the lottery. *Id.* Victim 1 was skeptical, she did not enter herself into any lottery, and she hadn't received anything in the mail documenting her winnings. Ex. A, at 1–2. But Carty was persistent. He insisted that all she needed to do to access her winnings was pay some taxes, fees, and other costs. *Id.*; *see also* Plea Agreement ¶ 8(b). Carty warned Victim 1 that the FBI was recording their calls and told Victim 1 she should not talk to anyone (except Carty) about the prize. Plea Agreement ¶ 8(d).

Shortly after the first contact, Carty called Victim 1 from a new phone number with a 360 area code, the area code that covers the place in Washington where Victim 1 lives. Ex. A, at 1. Carty falsely told Victim 1 that his company flew him to Washington on a private jet. *Id.* at 2. In reality, Carty created the new number using a Voice over Internet Protocol (VoIP) service, TextNow, which enabled him to hide his true identity. Plea Agreement ¶ 8(d). Carty chose the 360 area code to further deceive Victim 1. *Id.*

Carty initially told Victim 1 that she needed to pay about $57,000 for taxes, $3,000 to the FBI, a release fee, insurance, and a claim fee. *Id.* ¶ 8(c); Ex. A, at 1. Carty directed Victim 1 to withdraw cash in small denominations from different bank accounts and provided Victim 1 an address to send the money. Ex. A, at 2. Victim 1 was reluctant, but Carty eventually persuaded her that if she sent the money, she would get her prize. *Id.* Victim 1 relented and sent cash through the mail, as Carty directed.

United States' Sentencing Memorandum - 2
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B.      Overcoming Victim 1's resistance, Carty directed Victim 1 to sell her house and send him the proceeds.**

Victim 1 asked Carty for a refund after she sent him an initial allotment of money and did not receive her lottery winnings. *See* Ex. A, at 2–3. Carty told her there were no refunds, and that if she stopped paying, she would forfeit the money she already sent. *Id.* Victim 1 even tried to block Carty from contacting her, but Carty told Victim 1, "good morning, you block me now and you stop the package but that's okay have a good day." Ex. D, at 1. Carty eventually overcame Victim 1's resistance, persuading her that if she just paid a little bit more money, then she would receive the lottery prize he promised her. *See* Ex. A, at 3.

In the fall of 2020, Carty directed Victim 1 to pay an additional $130,000 to access her winnings. *Id.* Victim 1 didn't have that amount of money, so Carty told her to borrow money against her house to cover the costs. *Id.* Victim 1 complied, and in October 2020, borrowed about $150,000 against her home. *See* Plea Agreement ¶ 8(c). Between August 2020 and December 2020, she sent various individuals about $155,085 in cash and MoneyGram transfers at Carty's direction. *See* Ex. B, at 4.[1]

In early 2021, Victim 1 told Carty that she did not have any more money to pay the taxes and fees he told her were required to access her lottery winnings. Ex. A, at 3. Carty then directed Victim 1 to sell her house and send him the proceeds. *Id.*; *see also* Plea Agreement ¶ 8(c). Carty said that if she sold her house, he would give her one of his houses. Ex. A, at 3. In April 2021, Victim 1 sold her house and deposited about $448,000 into her bank account at Columbia Credit Union. Ex. C. Victim 1 used proceeds from the sale to send additional money to Carty. *See* Plea Agreement ¶ 8(c).

---

[1] Exhibit B, at 4 is an email exchange between AUSA Lauren Staniar and FBI Forensic Accountant Glenese Klein in which Ms. Klein itemizes fraud loss over certain periods based on the FBI's $601,005 fraud loss calculation.

United States' Sentencing Memorandum - 3
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**C.      Carty's lies and social engineering escalated between 2021 and 2024.**

Carty continued to call, email, and message Victim 1 over the course of the next several years, peddling lies about why she needed to send more money to access her lottery winnings. For example, in the spring of 2021, he demanded Victim 1 pay hundreds of thousands of dollars to cover what he claimed was a $275,000 IRS judgment against Publisher's Clearinghouse. Ex. A, at 3. Victim 1 initially refused. In May 2021, she wrote to Carty: "PCH run their business on their own, without any of my knowledge. I'm not responsible for their 275k lawsuit charges / According to your answer was 'yes' to my question for at 2 times that 130k was the last payment,which [sic] I had completed. And I believe that's the final payment for this whole win-pack." Ex. F, at 3.[2] Carty drew her back in with emotional manipulation, responding "[s]o now your [sic] questioning my loyalty." *Id.*

Carty told dozens of other lies to extract money from Victim 1. He claimed that packages with Victim 1's money were lost or stolen, that there was an unexpected customs fee of $250,000, that Publisher's Clearinghouse staff had stolen her money, and that Bank of America needed Victim 1 to pay for the checks the bank would use to distribute her winnings. *See* Ex. A, at 5–6.

Carty also made Victim 1 believe that "Preston" was a trusted friend and even confidant who was working on her behalf. He frequently called her "hun," "hunny," and "love" in messages. For example, in August 2020, Carty wrote to Victim 1: "go and get your self some rest hunny ok good night i love you / am going to have a little snack and then off to bed." Ex. D, at 5. In March 2022, Carty and Victim 1 exchanged the following messages:

---

[2] Exhibit F is excerpts from search warrant returns from TextNow. The government received the data from TextNow in Excel and printed excerpts to PDF to create Exhibit F. The sending number Carty used is in the document header. USA-00058006 covers sending number 602-946-5078. *See* Ex. O.

United States' Sentencing Memorandum - 4
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| From | To | Message |
|------|-----|---------|
| Carty (8848 Number) | Victim 1 | How's your son doing |
| Victim 1 | Carty (8848 Number) | Every day as usual life. |
| Carty (8848 Number) | Victim 1 | How is your lady friend doing |
| Victim 1 | Carty (8848 Number) | She's taking care herself good and busy with her life. |
| Carty (8848 Number) | Victim 1 | I understand |
| Carty (8848 Number) | Victim 1 | Just a matter time for you to do the same |
| Victim 1 | Carty (8848 Number) | I heard it many times and wandered how much time . . |
| Carty (8848 Number) | Victim 1 | Am doing my best towards getting your package to you |

Ex. F, at 4. In 2022, Victim 1 went to the hospital after Carty told her she needed to pay a $160,000 customs duty to access her prize. Ex. A, at 4. Victim 1 took months to recover from her illness. During this time, Carty called Victim 1 and pretended to check on her wellbeing. Ex. A, at 4.

Between August 2020 and February 2024, Carty and Victim 1 exchanged about 2,000 messages and calls. Plea Agreement ¶ 8(e).

**D.    Victim 1 uncovered Carty's fraud.**

Victim 1 became increasingly suspicious of "James Preston" through the fall and winter of 2023. Meanwhile, Carty—posing as Preston—escalated his demands for money, convincing Victim 1 to send couriers about $137,000 in wire transfers and Cashier's Checks between October 2023 and early February 2024. *See* Ex. B, at 4.

United States' Sentencing Memorandum - 5
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Then, in February 2024, Victim 1 insisted that Carty send her proof of her lottery prize and an accounting of the money she had paid. Carty sent paperwork purportedly from various financial institutions and government agencies showing millions of dollars held in an account for Victim 1. *See* Ex. G. An image of one document is below.



The documents Carty sent are fake. Law enforcement found a template for the documents when it searched Carty's iCloud account. *See* Ex. H.

Shortly after receiving this document, Victim 1 told her son about her purported lottery and the money she spent to access the winnings. Ex. A, at 5. Recognizing Carty's lottery scheme as a crime, Victim 1's son reported the scam to law enforcement.

**E.    Carty continued to harass Victim 1 after she detected his scam.**

Victim 1 stopped talking to Carty after she reported his crimes to law enforcement in February 2024. Carty did not take her silence well. He continued to contact Victim 1, and when she did not respond, he turned to drastic measures. *See* Plea Agreement ¶ 8(e).

United States' Sentencing Memorandum - 6
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In May 2024, Carty sent tow trucks from two different tow companies to Victim 1's residence. Carty falsely told one company that he was Victim 1's son "James," and that she needed her car towed. Carty told the other company that he was Victim 1's brother "James Preston," and Victim 1 needed her car towed. *See* Ex. J, at 1–2.

Carty attempted to resume contact with Victim 1 by calling her family. Victim 1's son recorded a call with Carty in July 2024. Carty falsely told Victim 1's son that Victim 1 won $250,000,000 and a car in the lottery. Ex. K, at 4. Carty tried to squeeze an additional $1,000 from Victim 1 on this call, claiming Victim 1 "is the one that is holding up everything at this point," and "I told her that she was supposed to pay an amount of $1,000 in order for me to have it put [the prize] on hold." *Id.*, at 9.

Carty continued harassing Victim 1 until he was arrested in Jamaica in August 2025. In July 2025, "James Preston" called Victim 1's property manager requesting a welfare check on Victim 1. Ex. J, at 3. "James Preston" was "pushy" on the phone and asked the property manager to identify Victim 1, which the property manager refused to do. *Id.* Around that same time, Carty (again posing as "James Preston") ordered a pizza to Victim 1's residence. Ex. J, at 4. About an hour after the pizza delivery, a cabbie knocked on Victim 1's door and explained her son "Preston" ordered a cab for Victim 1. *Id.* Victim 1 did not order a cab. *Id.*

It's unclear what the purpose of these contacts was, other than to harass and intimidate Victim 1 and let her know that wherever she was, Carty could contact her.

**F.    Carty stole more than $550,000 from Victim 1.**

Throughout the fraud, Carty directed Victim 1 to send money to couriers located throughout the United States, and never to Carty directly. *See* Plea Agreement ¶ 8(d). Carty texted Victim 1 addresses where she should send money—Victim 1 identified at least seventeen different names and addresses where she sent money at Carty's direction. Ex. I, at 1–2. Some of the couriers likely were willing participants in the scam, while others were victims themselves. Carty frequently directed Victim 1 to take pictures of the

United States' Sentencing Memorandum - 7
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

packages she sent to ensure they were properly addressed. Carty often lied and told Victim 1 that packages were lost or stolen as a way to convince her to send more money. *See* Ex. A, at 2–4. Carty mostly directed Victim 1 to send couriers cash through the mail—nearly $500,000 of the proceeds she sent was in cash. *See* Ex. B. Towards the end of the scam, Victim 1 refused to send cash through the mail, *see* Ex. A, so Carty directed her to send wires transmissions and Cashier's Checks. *See* Ex. B. These methods of sending money—cash through the mail, wires and Cashier's Checks to couriers— effectively concealed Carty's connection to the scam.

Victim 1 worked with her son to identify the losses she suffered as part of Carty's lottery scam. She identified more than $808,000. Ex. B, at 1. This included the proceeds from selling her home, as well as the money she saved for retirement. Plea Agreement ¶ 8(c). FBI reviewed Victim 1's bank statements and deducted from the loss amount any interbank transfers or unexplained cash deposits (on the theory that the deposits could be transfers between accounts). Ex. B, at 1–2. Using these conservative principles, FBI identified losses of at least $610,005. *See* Ex. B. Whether losses were $808,000 or $601,005, Carty's scam left Victim 1 financially devastated.

**G.      Carty spent Victim 1's money on a house, nice clothes, and jewelry.**

Because Carty keeps his assets abroad and because he directed Victim 1 to send money to couriers, the government does not have a precise accounting of how he used fraud proceeds. But Carty admitted he received fraud proceeds. Plea Agreement ¶ 8(h). And evidence from Carty's iCloud account show that, while he was defrauding Victim 1, he was spending money on nice clothes and jewelry in his home country of Jamica. Several images showing Carty's profligate spending are below:

United States' Sentencing Memorandum - 8
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



*See* Ex. H.

In 2022, after Carty stole hundreds of thousands of dollars from Victim 1, including the proceeds from the sale of her home, Carty purchased land in the prestigious Cedar Grove neighborhood of Mandeville, Jamaica. Ex. L, at 1; Ex. M. Carty provided notice that he planned to build a home on his new land. Ex. L, at 2.

**H.    Carty targeted other victims with the same lottery scam he used on Victim 1.**

Victim 1 was not Carty's only victim. *See* Ind. ¶ 24. Between August and December 2020, Carty exchanged more than 170 messages with Victim 2. These messages show that Carty demanded that Victim 2 send money to various couriers throughout the United States. *Id.* For example, in August 2020, Carty directed Victim 2 to send money to courier M.G. of Myrtle Beach, South Carolina. *Id.*

| From | To | Message |
|------|-----|---------|
| Carty   (2149 Number) | Victim 2 | ok hunny what time will u get things done?? |

| From | To | Message |
|------|----|---------|
| Victim 2 | Carty (2149 Number) | I need to know how much. As soon as I can. I work at 12 |
| Carty (2149 Number) | Victim 2 | the amount was 450 now holding fee added of 250 so add it together |
| Carty (2149 Number) | Victim 2 | we need to arrange your delivery for this Saturday will that be okay??? |
| Victim 2 | Carty (2149 Number) | I will be off then and it would be great if that could happen. Can you send me address it went off my phone |
| Carty (2149 Number) | Victim 2 | ok love |
| Carty (2149 Number) | Chunn | [M.G.] [REDACTED] myrtle beach sc 29577 |

Ex. F, at 1. As with Victim 1, the scam appeared to leave Victim 2 destitute. On August 27, 2020, Victim 2 sent the following message to Carty: "What else are they going to tell me to pay. Right now I have 50$ in my bank. It looks like I'm going to have to quit if something does not change as bad as I hate to think that. Love always." Carty replied: "just relax and keep calm." *Id.* at 2

Carty attempted to lure other victims with the same lottery scam he used on Victims 1 and 2. Ex. N, at 1. For example, in March 2023, Carty sent the following message to an unidentified victim: "My name is James Preston from claims department of PCH." Ex. F, at 5. The victim responded: "Ha ha ha really I don't believe that." Carty persisted with the following messages: "We send you a notification by mail there have been no reply confirmation with processing of your claim / We have a agent contacted you abt this before correct?? / I tried call,call us back ASAP." *Id.* Later that month, Carty sent similar messages to another unidentified victim: "Hi Ms brown,this is James director manager from claims department of PCH / On the 5th of March we have a ball-roll of draw in which your name have been selected as one of our luckiest winners from the start of year,winning yourself a whopping $2.5million dollars and Also a brand new 2023 Mercedes Benz congratulations." Ex. F, at 5. Carty sent numerous similar messages to prospective victims. *See* Ex. O, at 2

United States' Sentencing Memorandum - 10
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## I.    Carty is charged, extradited, and pleads guilty.

In November 2024, a grand jury sitting in the Western District of Washington charged Carty with four counts of wire fraud and four counts of mail fraud for his scheme to defraud Victim 1 and others. *See* Ind. (Dkt. No. 1). Carty was arrested in Jamaica August 2025. Plea Agreement ¶ 8(f). He made his appearance in this district in the fall of 2025. Carty later pled guilty to one count of wire fraud. Plea Agreement ¶ 1. Sentencing is scheduled for May 14, 2026 before this Court. The government does not request an evidentiary hearing.

## III.    SENTENCING GUIDELINES CALCULATIONS

The government agrees with the offense level computation in the Presentence Report, which is as follows:

| Description | Citation | Adjustment |
|---|---|---|
| Base offense level | USSG § 2B1.1(a)(1) | +7 |
| Fraud loss between $550,000 and $1,500,000 | USSG § 2B1.1(b)(1)(H) | +14 |
| Substantial financial hardship to one or more victims | USSG § 2B1.1(b)(2)(A)(iii) | +2 |
| Substantial part of the fraud was committed from outside the U.S. | USSG § 2B1.1(b)(10)(B) | +2 |
| Defendant knew or should have known Victim 1 was a vulnerable victim | USSG § 3A1.1(b)(1) | +2 |
| Acceptance of responsibility | USSG § 3C1.1 | -3 |
| **TOTAL** | | **24** |

This guidelines calculation reflects the parties' plea agreement, Plea Agreement ¶ 9, and each provision is amply supported by the record:

**Fraud loss between $550,000 and $1,500,000.** Carty admitted that the loss Victim 1 suffered exceeded $550,000. Plea Agreement ¶ 8(g). Victim 1 identified

United States' Sentencing Memorandum - 11
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

$808,143.85 in losses. *See* Ex. B. FBI took a conservative approach to the loss calculation and confirmed that Victim 1's losses were at least $601,005. Ex. B.

**Substantial financial hardship to Victim 1**. Substantial financial hardship may include "suffering substantial loss of a retirement, education, or other savings or investment fund," or a victim "making substantial changes to his or her living arrangements, such as relocating to a less expensive home . . . ." USSG § 2B1.1, cmt. n. 4(F). Victim 1 experienced both: Carty persuaded her to send all the money she had available. When she told him she had nothing left, he directed her to sell her home and send him the proceeds. She complied. Plea Agreement ¶ 8(c).

**Fraud committed from outside the United States**. Carty is a Jamaican citizen who lived in Jamaica throughout the entire fraud and perpetuated the scam from there. *See* Ex. G; Plea Agreement ¶ 8(f), (i).

**Victim 1 was a vulnerable victim**. Carty admitted that he knew and exploited multiple traits of Victim 1 that made her vulnerable to his scam, including that she was elderly. Plea Agreement ¶ 8(e). This enhancement applies. *See United States v. Lawson*, 128 F.3d 243, 250–51 (4th Cir. 2025) ("old age is plainly a characteristic that can make a victim vulnerable to certain types of crime" including sweepstakes scams).

Carty's total criminal history score is zero, which places him in criminal history category I. A total offense level of 24 and a criminal history category of I yields a U.S. Sentencing Guidelines range of 51–63 months.

## IV.    SENTENCING RECOMMENDATION

The 18 U.S.C. § 3553(a) factors discussed below merit a severe sentence for Carty's severe conduct. The government respectfully requests the Court sentence Carty to 41 months in prison and order restitution in the amount of $601,005.

### A.    Carty's crimes were relentless and devastating.

The egregiousness of Carty's crimes supports the government's requested 41-month sentence. Four aspects of the crime are particularly aggravating here.

United States' Sentencing Memorandum - 12
*United States v. Carty*, CR24-5250-TMC

*1.     Carty was extremely persistent and manipulative.*

Carty used several common tools in the scammers playbook to impose maximum financial devastation on Victim 1—he isolated her from her family and then played on her hope and fears to convince her to send couriers hundreds of thousands of dollars.

At the very outset of the scam, Carty used fear and psychological manipulation to get what he wanted from Victim 1. He knew that the best way to trick Victim 1 was to isolate her from her family and friends. So, he repeatedly told her not to tell anyone about her purported lottery prize. *See* Ex. A, at 1. He even told her that the FBI was monitoring their calls and that she was being watched. *See id.*; Plea Agreement ¶ 8(c). His lies were successful—Victim 1 waited three and a half years to tell her son about Carty's scam.

Carty also groomed Victim 1, building her trust so he could take advantage of her. Carty first contacted Victim 1 in August 2020, at the height of the COVID-19 pandemic when many Americans were social distancing and isolated from family and friends. Carty ingratiated himself to Victim 1: he called her "hon" and "love." Supra § II.C. He asked about her family. He and Victim 1 exchanged thousands of calls and messages. He pretended to care about her health and wellbeing. He promised her he was doing everything he could to get her the lottery prize. *See id.*

Carty then manipulated Victim 1's trust to steal as much money from her as possible. Carty started small with his demands. When he first contacted Victim 1 in August 2020, he told her she only needed to pay about $62,000 to access $22 million in lottery winnings. He also urged her to make small payments of a few thousand dollars at a time. *See* Ex. A, at 1–2. Victim 1 lived on a fixed income. She was understandably excited at the prospect of winning millions of dollars in the lottery—$62,000, paid in small installments, must have seemed like a small price to pay to access unimaginable wealth. Carty designed it that way.

Victim 1 asked for a refund in September 2020, after she had already paid Carty thousands of dollars. *See* Supra § II.B. Carty refused, manipulating a common cognitive

bias known as the sunk cost fallacy.[3] He told Victim 1 that she just needed to pay a little bit more to access millions, and if she stopped paying, she would lose everything. Victim 1 was understandably worried that she would lose her money if she walked away, and Carty persuaded her that it was worth paying more money to access the millions he promised. *See id.* Carty used this method to escalate his demands for money: What was at first $62,000 became $130,000 and then became $275,000. *See* Ex. A (Victim 1 explaining the progression of Carty's demands). Victim 1 believed that each payment put her a step closer to accessing her lottery winnings.

And when Victim 1 expressed doubts, Carty overcame them. Carty and Victim 1 were in contact thousands of times over the scam. *See* Plea Agreement ¶ 8(e). The volume of contacts reveals a sad truth about Carty's crimes: He broke Victim 1's resolve by sheer persistence. In the first two months of the scam—August and September 2020—Carty contacted Victim 1 hundreds of times. He was relentless. He called and messaged her to check on the status of the cash she sent his couriers, peddle lies about why he needed more money from her, and give her directions on how to hide cash in FedEx packages. Carty called Victim 1 using VoIP numbers with Washington area codes to trick Victim 1 into believing that Carty was in her community. Ex. A, at 1. He even told her that his company flew him to Washington on a private jet so he could be closer to her. Ex. A, at 2.

---

[3] Caeleigh MacNeil, Asana.com, Sunk cost fallacy: Definition, examples, how to avoid (Dec. 10, 2025), https://asana.com/resources/sunk-cost-fallacy.

United States' Sentencing Memorandum - 14
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Victim 1 tried to end the scam multiple times, but Carty always drew her back in using the trust he built over years. For example, when Victim 1 briefly cut off communications with Carty in the fall of 2023, he sent a barrage of pleading emails, several of which are shown below:



Victim 1 eventually relented, resumed contact with Carty, and was persuaded to send him an additional $137,600 before she finally reported the fraud to her son. *See* Ex. B, at 4.

    2.    *Carty targeted Victim 1 because she was elderly and vulnerable.*

Carty knew that Victim 1 was elderly and exploited that fact to take her money. Courts consistently find that "elderly victims are susceptible to telemarketing fraud," *United States v. Scrivner*, 189 F.3d 944, 950 (9th Cir. 1999), including lottery scams, *United States v. Lawson*, 128 F.4th 243, 251 (4th Cir. 2025). As the Fourth Circuit observed in *Lawson*, "[e]lderly individuals often live alone, with children out of the

United States' Sentencing Memorandum - 15
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

house and a spouse who has passed away. . . . They may lack the strength, stamina, and acuity to resist a crafty con man." *Id.* That's particularly true where, as here, the con man contacts the victim thousands of times over the course of the fraud.

Lottery scams like Carty's impose a significant financial toll on America's seniors. FBI data shows that people sixty and above lost more than $136 million to lottery/sweepstakes scams in 2025.[4] Washington seniors lost more than $2.7 million to these types of scams that year.[5] These figures reflect only reported losses, the actual losses are likely multitudes higher.

Indeed, people like Carty have made aging in America extremely perilous. Senior citizens reported losing more than $7.7 **billion** to scams and frauds in 2025, a 59% increase from 2024. FBI iC3 Report, at 44. Seniors regularly battle scam calls, emails, and texts. One moment of weakness or doubt may open the door to financial ruin. Also, many older adults are retired and live on a fixed income, so assets lost to fraud cannot be easily replaced through additional earnings in the workplace. Ex. N, at 2. In other words, once the money is gone, it's gone, and victims like Victim 1 are left living with the consequences. These financial losses are compounded by the psychological devastation of falling for a scam. Older adult victims of these crimes experience high rates of depression and anxiety. Ex. N, at 5. Scam victims also experience loss of independence because family may perceive them as no longer capable of managing their finances.

Here, Carty not only imposed financial and psychological devastation on Victim 1, he also threatened her sense of safety and security. Carty contacted Victim 1's family when he couldn't get ahold of her, even going so far to call her grandchild. Ex. E, at 2. When Victim 1 cut off communication with Carty in February 2024, Carty took to sending tow trucks, pizza, and cabs to her residence. *See* Ex. J. The message in these

---

[4] Fed. Bureau of Inv., Internet Crimes Report 46 (2025) https://www.ic3.gov/AnnualReport/Reports/2025_IC3Report.pdf (hereinafter FBI iC3 Report).
[5] Fed. Bureau of Inv., Internet Crimes State Report, Washington (last visited, May 6, 2026), https://www.ic3.gov/AnnualReport/Reports/2025EFState/#?s=54.

United States' Sentencing Memorandum - 16
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

contacts was clear—Carty knew where Victim 1 lived and would stop at nothing to talk to her. Understandably, Victim 1 was terrified. What finally stopped Carty from contacting Victim 1 was his arrest in Jamaica on the government's warrant.

   3.    *Carty tried to conceal his connection to the scam.*

Carty's penchant for deception is entirely aggravating and militates in favor of the government's recommended 41-month sentence. Carty invented a fake persona—James Preston of Publisher's Clearinghouse—to scam Victim 1. He used another persona, "Michael," to scam Victim 2.

He also used fake telephone numbers and email accounts throughout the scam. Victim 1 identified four main telephone numbers and one main email address Carty used to contact her throughout the fraud: 360-622-2149, 360-917-8848, 602-946-5078, and jamespreston987@yahoo.com. Ex. I. Each of the telephone numbers was issued by TextNow, a voice over internet protocol (VoIP) company that Carty used to distance himself from the scam and avoid detection by Victim 1 and law enforcement. Plea Agreement ¶ 8(d). Carty chose numbers with a 360 area code to persuade Victim 1 that he was calling her from within her community in Washington. Plea Agreement ¶ 8(d).

Carty worked hard to distance himself from the losses he caused. Throughout most of the fraud, Carty directed Victim 1 to withdraw cash in small denominations from different bank accounts to avoid suspicion from the financial institutions. Plea Agreement ¶ 8(d). To conceal his connection to the fraud and further trick Victim 1, Carty directed Victim 1 to send this money to various witting and unwitting money couriers throughout the United States and Jamaica. *Id.* Carty sometimes counseled Victim 1 on how to best package cash in envelopes to avoid suspicion from mail carriers. Ex. A, at 2. When Victim 1 refused to mail cash or Cashier's Checks, Carty directed her to wire money to couriers located in the United States, who eventually sent the money to Carty. Ex. A, at 2. Carty directed Victim 1 to lie to her banks about the purpose of the wires to further conceal that the money was going to Carty's associates as part of a lottery scam. Ex. A, at

United States' Sentencing Memorandum - 17
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2. Carty never directed Victim 1 to send money directly to him. Plea Agreement ¶ 8(d). Carty nevertheless received fraud proceeds from couriers. Plea Agreement ¶ 8(h).

These lies had two practical impacts: First, they helped Carty trick Victim 1 into believing he was "James Preston," a sophisticated U.S.-based businessman, rather than Roshard Carty, a car dealer from Jamaica. Plea Agreement ¶ 8(b). Second, they made it extremely difficult for law enforcement to trace and seize proceeds of Carty's fraud. *See* Ex. B (FBI financial analysis).

4.　　*Carty's fraud left Victim 1 destitute while he prospered.*

Carty also knew that he was leaving Victim 1 essentially homeless and penniless, and he didn't care. In fall of 2020, Victim 1 told Carty that she did not have any more money to send him. Ex. A, at 3. Instead of showing compassion, Carty directed Victim 1 to sell her house and send him the proceeds. *Id.* This callousness is almost hard to imagine and militates heavily in favor of the government's requested 41-month sentence.

By the end of the fraud, in February 2024, Victim 1 had very little money left. Carty, meanwhile, lived large in Jamaica. He wore jewelry and nice clothes, and boasted fancy cars. *See* supra § II.G. He also bought land in a prosperous neighborhood and made plans to build a house. *Id.* And because Carty stashed proceeds abroad, the government was unable to seize money to return to Victim 1. The sad truth is Victim 1 is unlikely to recover any of the money she lost—a lengthy sentence for Carty will be her only justice.

**B.　　A 41-month Sentence is Necessary to Promote Respect for the Law, Afford Deterrence, and Protect the Public.**

Carty's actions also make clear that a significant sentence is necessary to promote respect for the law, protect the public from Carty, and deter him and others in his position from other criminal conduct. *See* 18 U.S.C. § 3552(a)(2). The government believes that a 41-month sentence would be sufficient, but no greater than necessary, to serve those important interests.

United States' Sentencing Memorandum - 18
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Carty had ample opportunity to exit this scheme or even show a modicum of compassion to Victim 1. He could have stopped hounding her for money in the fall of 2020 when she told him she had nothing left. Or he could have left her alone after she went to the hospital in 2022. He did not take these offramps. Instead, he repeatedly returned to Victim 1 to steal more money, even after he knew she was broke. Carty's dogged attempts to reconnect with Victim 1 in 2024 and 2025—by sending local vendors to her residence—show that only a lengthy prison sentence will protect Victim 1 and the public and promote deterrence.

Carty's conduct is also not limited to Victim 1. He used the same lottery scam to defraud Victim 2 and others, even stealing money from Victim 2 when he knew she had $50 left in her bank account. *See* Supra § II.H. And Carty repeatedly contacted other victims with the same story that he used to trick Victim 1—that he was "James Preston" from Publisher's Clearinghouse, calling to notify the victim of their lottery winnings. *See id.* Carty's willingness to target other victims with the same scam he used on Victim 1 reinforces that a meaningful prison sentence is necessary to protect the public.

As U.S. Probation aptly observed, there is little to stop Carty from resuming his scamming activities once he returns to Jamaica. Carty's conduct here shows he is relentless, callous, and has an aptitude for deception—he is unlikely to be deterred by the reality that his conduct left people like Victim 1 destitute. Carty *knew* Victim 1, Victim 2, and likely others were insolvent because of him, and yet he persisted in his scam. And unlike with U.S.-based defendants, the U.S. Probation Office cannot effectively monitor Carty when he returns home. These facts militate heavily in favor of the government's requested sentence.

A lengthy sentence is also necessary to put other lottery scammers on notice that the United States takes this kind of elder fraud seriously. That aim is particularly important given that elder scams and frauds are on the rise. *See* FBI iC3 Report, at 44. Elder scams like Carty's are devastating and unraveling them requires tremendous

United States' Sentencing Memorandum - 19
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

resources. Lottery scams are generally perpetrated from outside the United States, making it even more time consuming to bring the perpetrators to justice. A serious period of incarceration will send an important signal to other scammers that this kind of fraud carries heavy consequences.

## C.        The Government's requested sentence will not yield disparities.

Courts around the country consistently impose stiff sentences on lottery scammers like Carty, reflecting an interest in holding these individuals accountable for the devastation they cause. This spring, the United States District Court for the District of Maryland sentenced two Jamaican nationals to 40 and 42 months in prison, respectively, for their roles in perpetrating long-running lottery scams against individuals throughout the United States. *See United States v. Henry, et al.*, 24-cr-00004, Dkt. No. 201 (D. Md. Mar. 23, 2026) (40 months for defendant Farquharson); *United States v. Henry, et al.*, 24-cr-00004, Dkt. No. 177 (D. Md. Mar. 23, 2026) (42 months for defendant Campbell). In December 2025, a different Jamaican national was sentenced to 63 months in prison for stealing about $200,000 from an elderly woman as part of a lottery scam. *United States v. Anderson*, 23-cr-40018, Dkt. No. 110 (D.S.D., Dec. 16, 2025).

Like Carty, these defendants falsely claimed their victims won millions of dollars in the lottery and that they needed to pay taxes and fees to access their winnings. Also like Carty, each defendant carried on the scam for years and used increasingly desperate lies to extract money from their victims. Recognizing the cruelty of this scam, courts sentenced these individuals to years in prison.

The government's requested 41-month sentence is also in line with other sentences in this district with similar fraud loss. Judge King sentenced defendant in *United States v. McClellon* to 42 months in prison for stealing about $500,000 in COVID-19 relief funds. *See* 22-cr-00073-LK, Dkt. No. 298 (W.D. Wash., May, 29, 2025). More recently, the Court imposed 30 months in custody for the defendant in *United States v. Radcliffe* who

United States' Sentencing Memorandum - 20
*United States v. Carty*, CR24-5250-TMC

befriended an elderly woman and spent part of her life savings before she died. 25-cr-00222-LK, Dkt. No. 42 (W.D. Wash. Mar. 10, 2026).

In many ways, Carty's conduct is worse than McClellon's or Radcliffe's: Carty manipulated and terrorized an elderly victim, eventually convincing her to send him and his co-schemers nearly all of the money she saved for retirement. 41 months is the appropriate sentence for this crime.

**D.     The Court must order restitution.**

The government is extremely skeptical that Carty will pay any restitution in this case: Carty's assets are abroad, where the U.S. lacks traditional tools to collect on a restitution judgment. That is in part why the requested 41-month sentence is necessary to punish and deter Carty and provide justice to the victims. The Court is nevertheless required to impose restitution as part of its judgment. The government requests a restitution award of $601,005 to Victim 1.

The Mandatory Victim's Restitution Act provides that "the court shall order . . . that the defendant make restitution to the victim of the offense" when the offense of conviction is one listed in the statute. 18 U.S.C. § 3663A(c)(1)(B). A victim under the MVRA is "any person directly harmed by the defendant's criminal conduct in the course of the scheme." 18 U.S.C. § 3663A(a)(1)-(2). The amount of restitution is calculated based on the victim's actual loss. *See United States v. Gagarin*, 950 F.3d 596, 607 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2729, 210 L. Ed. 2d 887 (2021). A district court has "wide discretion in fashioning restitution orders." *United States v. Grovo*, 826 F.3d 1207, 1221 (9th Cir. 2016). The government is required to prove the amount of the victim's loss for restitution purposes by a preponderance of the evidence. *See United States v. Peterson*, 538 F.3d 1064, 1075 (9th Cir. 2008).

The evidence amply supports a restitution judgment of $601,005. The parties agreed that the amount of restitution is between $550,000 and $834,751. Plea Agreement ¶ 12. Victim 1 identified $808,143.85 in losses attributable to Carty's scam. Ex. B. The

United States' Sentencing Memorandum - 21
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

FBI took a conservative view of her bank accounts and confirmed that losses were at least $601,001. Ex. B. This analysis identified and excluded from Victim 1's calculation $49,400 in transfers between Victim 1's accounts. *Id.* It also deducted about $100,000 in cash deposits into Victim 1's bank accounts. *Id.* As the FBI accountant explained, "[d]ue to the unknown nature/source of these cash deposits and the fact they occurred during the time where cash withdrawals were being conducted" they were excluded from the loss calculation. *Id.* This analysis gives Carty every benefit of the doubt. The government therefore requests the Court order $601,005 in restitution in favor of Victim 1.

## V.    FORFEITURE

Like restitution, forfeiture is a mandatory element of Carty's sentence. *See United States v. Feldman*, 853 F.2d 648, 663–64 (9th Cir. 1988), cert. denied, 489 U.S. 1030 (1989); *United States v. Carter*, 742 F.3d 440 (9th Cir. 2014). The parties did not agree on a precise forfeiture amount in the plea agreement. The government filed a motion at docket number 41 seeking a forfeiture money judgment of $91,500.80. As explained in the motion and accompanying declaration, that is the amount of money the government can most closely tie to Carty. Although, as explained, Carty's use of cash and money couriers, coupled with his foreign bank accounts, made it nearly impossible for the government to accurately trace fraud proceeds. *See* Supra § II.G. And, judging from the lifestyle reflected in his iCloud account, Carty obtained much more from the fraud. *Id.*

//

//

United States' Sentencing Memorandum - 22
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## VI.   CONCLUSION

For the foregoing reasons, the government respectfully requests the Court sentence Carty to 41 months in prison and order restitution in the amount of $601,005.

DATED: May 7, 2026.

Respectfully submitted,

*s/ Lauren Watts Staniar*
LAUREN WATTS STANIAR
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271

United States' Sentencing Memorandum - 23
*United States v. Carty*, CR24-5250-TMC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970