THE HONORABLE TIFFANY M. CARTWRIGHT

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR24-5250-TMC |
| Plaintiff, | |
| v. | MR. CARTY'S SENTENCING MEMORANDUM |
| ROSHARD CARTY, | |
| Defendant. | |

Mr. Carty comes before the Court for sentencing on one count of wire fraud. He respectfully requests the Court sentence him to 12 months and one day in custody and no term of supervised release.

## I.    BACKGROUND

Mr. Carty is a Jamaican citizen; he has lived in Jamaica his whole life. The extradition flight for this offense was his first trip to the United States. Although he downplays the difficulty of his childhood, it is clear from his description he endured significant trauma while growing up. PSR ¶49. He was abandoned by his parents at birth, and then lived in a series of homes where he suffered abuse from at least one household member, until he moved to live with his paternal aunts when he was 15. PSR ¶49. This experience continues to shape him as an adult; in his letter to the Court, he expresses how important it is for him to be a present father for his children. Ex. 1.

MR. CARTY'S SENTENCING MEMORANDUM
(*United States v. Carty*, No. CR24-5250 ) - 1

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Since about 2015, Mr. Carty mainly made his living buying and selling cars. PSR ¶61. In 2017, he had major surgery to remove a brain tumor that was non-cancerous but caused debilitating symptoms.[1] Recovery from the surgery was very difficult. Mr. Carty had to relearn how to walk, and his speech, balance, and mobility were affected for an extended period after the surgery. As he discusses in his letter, he couldn't drive and had to pay someone to assist with transportation and other tasks. Then, in 2019/2020, the COVID pandemic hit. Already in financial difficulty because of the surgery, the pandemic put Mr. Carty even further behind. Travel restrictions decreased demand for cars, and all but shut down the small bar he ran.

He was taken into custody in Jamaica on August 21, 2025, and has been in custody since that date. PSR ¶4. At the time of sentencing, he will have been in custody for just under nine months.

## II.    OTHER RELEVANT FACTS

### A.    Jamaican Lottery Scheme

The "lottery scam" has a history in Jamaica dating as back as far the 1990s, growing out of the call centers established in and around Montego Bay. In the mid-1980s, the Jamaican government took steps to encourage foreign investment in the Jamaican economy. A special economic zone established in Montego Bay was successful in attracting the "business process outsourcing" (BPO) industry—third party vendors who handle data processing, HR administration, call centers, and other noncore business tasks for companies.[2] BPO companies found Jamaica an attractive place to do

---

[1] Counsel had made repeated efforts to get records by phone, email, and fax, but the hospital records department has not responded.

[2] Caribbean Policy Research Institute (CAPRI), *Scamming, Gangs, and Violence in Montego Bay* at 21–22 (September 2019). Available at https://www.capricaribbean.org/sites/default/files/documents/r1901scamming-gangs-and-violence201909_0.pdf

MR. CARTY'S SENTENCING MEMORANDUM
(*United States v. Carty* , No. CR24-5250 ) - 2

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

business. Jamaica has an English-speaking workforce, similar time zones to the United States, and relatively low wages.[3] The Jamaican government also invested in training for workers, including training in sales and communication. *Id.*

In addition to customer service training, call center employees, some of whom worked servicing loans or billing, gained a familiarity with the American system of debt and credit. *Id.* at 65–66.[4] Call center employees also had access to the names, phone numbers, and other identifying information of thousands of Americans. According to one theory, a group of Nigerians working in Jamaica adapted a Nigerian advance fee scam into the initial version of the Jamaican lottery scam.[5] Whatever the precise origins, the BPO sector "provided fertile soil for lottery scamming to become rooted."[6]

In subsequent years, lottery scamming has spread beyond the initial group of call center workers, across the island of Jamaica, and into the United States. *Id*. at 23. A scamming enterprise may have an "intricate network of persons" who carry out roles of "lead list compiler/broker,[7] the dialer, the collector, the diverter, and the transporter." *Id*. at 25.

---

[3] Jovan Scott Lewis, *Scammer's Yard: The Crime of Black Repair in Jamaica*, 59–60 (2020).

[4] CAPRI at 23-24.

[5] Paul Andrew Bourne et al., *Lottery Scam in a Third-World Nation: The Economics of a Financial Crime and its Breadth*. Asian J. Bus. Manage. 5(1): 19-51, 32 (2013).

[6] CAPRI at 22.

[7] "Lead lists" are lists of "names, addresses, birth date information, phone numbers, and email addresses." BPO companies now "heavily police" access to customer data, but lists can be gathered from the tourism industry or purchased from data brokers. *Id*. at 22–24.

MR. CARTY'S SENTENCING MEMORANDUM
(*United States v. Carty* , No. CR24-5250 ) - 3

**B.        Attitudes toward scamming within Jamaica**

Despite efforts to crack down on lottery scamming, studies have shown that "there is a high tolerance for scamming in Jamaica."[8]

> A 2017 survey found that many Montegonians considered scamming morally acceptable, and its merits worthy of celebration. This tolerance is a manifestation of an extant tolerance for crime and violence in general, as well as it has its own scamming-specific dynamics. Tolerance means that the power of negative social sanctions has been reduced…

*Id* at 33.

This tolerance was justified on various bases –scamming is a "victimless crime"; to the extent victims are recognized, they can either afford the loss or are deserving of being scammed because they are "too greedy"; these schemes bring money into the local economy; or, as expressed in a popular song, scamming is "tied up in the notion of reparations for enslavement and colonialism." *Id*. at 33–34.

Professor Jovan Scott Lewis examined the Jamaican lottery scam in depth in his book, *Scammer's Yard: The Crime of Black Repair in Jamaica*. As a graduate student, he lived in Jamaica and studied three young men engaged in lottery scamming. In one section, he examined the attitude of the men toward the victims of their scam. Ex. 2. In it, he discussed the difference between the morality of the scam (good vs. bad) and the ethical question of the scam (the societal and cultural norms). Ex. 2. [Professor Scott clarified later in the book "while compelling, the [] claim of the scam as reparations is undoubtedly specious." *Id*. at 156.]

Counsel sets this forth not to attribute any of these particular views to Mr. Carty, or because these views are correct or justify Mr. Carty's actions here, but instead to give the Court some cultural context when evaluating Mr. Carty's history and characteristics.

---

[8] CAPRI at 33.

MR. CARTY'S SENTENCING MEMORANDUM
(*United States v. Carty*, No. CR24-5250 ) - 4

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

## III.    SENTENCING CONSIDERATIONS

### A    Mr. Carty will serve a much longer sentence, under harsher conditions, than a similarly-situated United States citizen.

Jamaica does not have a prisoner transfer treaty with the United States, so Mr. Carty will serve any sentence in this country.[9] As set forth in the accompanying declaration by prison consultant Janet Perdue, the Federal Bureau of Prisons (BOP) will likely consider Mr. Carty a "Deportable Criminal Alien." Ex. 3 at ¶15. As a result, he will not be eligible for designation to a minimum-security camp; at best, he will be designated to a low-security prison. *Id.* at 3 at ¶¶17–18. He will not be eligible to earn First Step Act credits, meaning he could lose out on up to a year of credit on a 36-month sentence. *Id.* at ¶10. He cannot be transitioned to serve the end of his sentence in a Residential Reentry Center or on home confinement. *Id.*¶23–24. Finally, at the end of his custodial sentence, he faces an additional indeterminate period of confinement in immigration detention. *Id*. at ¶19–21.

Mr. Carty did not enter the United States without permission; he was flown here by the United States Marshals pursuant to a Court order. He will receive a two-point enhancement under the Guidelines to reflect the fact that he committed the offense from Jamaica. PSR ¶29. The vagaries of BOP policy that result in a longer sentence under harsher conditions for Mr. Carty have no basis in the §3553(a) factors, and Mr. Carty respectfully requests the Court consider the actual length and conditions of his term of imprisonment when imposing sentence.

### B.    Mr. Carty is vulnerable in custody because of his visual disability, cultural differences, and widespread staffing shortages at BOP

---

[9] U.S. Department of Justice: Criminal Division, *List of Participating Countries/Governments.* Available at https://www.justice.gov/criminal/criminal-oia/list-participating-countriesgovernments

MR. CARTY'S SENTENCING MEMORANDUM
(*United States v. Carty* , No. CR24-5250 ) - 5

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

The Court is no doubt familiar with the current staffing crisis inside BOP. The Office of Inspector General has concluded that staffing shortages negatively affected inmate safety and the availability of programming. At FCI Sheridan, the OIG found that staffing shortages

> caused inmates to be minimally supervised or, in certain instances, not supervised at all. This condition creates a number of safety and security risks, including the risks of inmate self-harm; violence toward employees or other inmates; and other illicit activities, including the introduction and use of illegal drugs.[10, 11]

Limited supervision also forced institution management to "habitually confine (or lock down) inmates to their cells during daytime hours…[t]his decision in turn prevents inmates from participating in institution programming and recreational activities." *Id*. at 4. And employee shortages and augmentation[12] of non-custody employees "created significant backlogs for inmate programs." *Id*. at 13. Shortages also negatively impact medical care.[13] Augmentation hours increased from Fiscal Year (FY)

---

[10] *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Sheridan*, Department of Justice Office of the Inspector General, Evaluation and Inspections Division (May 2024). Available at https://oig.justice.gov/sites/default/files/reports/24-070_0.pdf

[11] Remarkably, since July 28th of 2025, *all* but one of the BOP press releases have either announced the death of an inmate (39) or escapes from a prison camp (6). Available at https://www.bop.gov/resources/press_releases.jsp

[12] "Augmentation" refers to the practice of requiring non-custody staff to work as custody officers.

[13] *See*, *e.g.*. Department of Justice, Office of the Inspector General, *Evaluation of the Federal Bureau of Prisons' Colorectal Cancer Screening Practices for Inmates and Its Clinical Follow-up on Screenings* (May 2025). Available at https://oig.justice.gov/sites/default/files/reports/25-057.pdf (finding lack of screening, delays in follow up care); *Inspection of the Federal Bureau of Prisons' Federal Detention Center SeaTac*, Department of Justice Office of the Inspector General, Evaluation and Inspections Division (September 2025). Available at https://oig.justice.gov/sites/default/files/reports/25-081.pdf (Health Services

MR. CARTY'S SENTENCING MEMORANDUM
(*United States v. Carty*, No. CR24-5250 ) - 6

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

2023 to FY2025; the number of augmentation hours in FY2025 was the highest it has been in the 10-year period starting with FY2016.[14]

These conditions recently prompted four members of the House Committee on the Judiciary to send a letter to the director of the Bureau of Prisons, expressing alarm at the staffing shortages and demanding that the director "immediately remedy ongoing staffing shortages that have jeopardized the safety and security of both prison facilities personnel and inmates."[15]

One illustrative example can be found in Mr. Carty's BOP medical file. Since his brain tumor and removal, Mr. Carty has a visual disability, as he describes in his letter to the Court. Ex. 1. On November 19, 2025, Mr. Carty was seen by medical after he fell off the top bunk three days earlier. The medical provider was clearly skeptical that Mr. Carty suffered any injury. Ex. 4 at 4. An x-ray was ordered, but not performed for nearly three weeks. *Id.* at 5. The x-ray *did* show that Mr. Carty had fractured one of his ribs. There is no record that anyone from medical ever followed up with Mr. Carty about the result of his x-ray, or even looked at the result.

As Mr. Carty notes in his letter, he is Jamaican, and there are cultural differences between himself and other inmates that can lead to misunderstanding or conflict. He

---

Department was "severely understaffed" resulting in delayed in medical treatment, preventative healthcare screenings were not provided, unsafe medication practices, and unsanitary conditions.).

[14] Congressional Research Service, *Correctional Officer Staffing in Federal Prisons: Background and Issues* at 14 (January 26, 2026). Available at https://www.congress.gov/crs-product/R48826

[15] Letter from Reps. Raskin, McBath, Crockett, Neguse to BOP Director William K. Marshall, III (Feb. 20, 2026). Available at https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2026-02-20-raskin-mcbath-et-al-to-marshall-bop-re-staffing-issues.pdf

MR. CARTY'S SENTENCING MEMORANDUM
(*United States v. Carty* , No. CR24-5250 ) - 7

does not share the fact of his visual disability with other inmates to avoid being victimized, but he still lacks peripheral vision and is prone to accidents, like falling off the bunk. In a custodial environment with severe staffing shortages, these factors can make Mr. Carty even more vulnerable to harm from other inmates.

### C.    3553(a) factors

Mr. Carty is extremely remorseful for the harm he caused Victim 1, especially now that he has had an opportunity to review discovery and understand the consequences for Victim 1. Mr. Carty now recognizes that Victim 1 is not some stereotype or "rich American," but an actual person who suffered real harm. As he says in his letter,

> To the victim and her family, I know my word will never make up for taking advantage of the individual. This apology to the victim and her family which probably will not [be] accepted but I know deep within me this is one big lesson that never ever I forget.

Ex. 1 at 1.

Mr. Carty has no prior criminal history; the Court may wish to consider that at the time of the offense, Mr. Carty was in Jamaica, surrounded by the societal norms and attitudes towards the "lottery scam" as set forth *supra*.

Mr. Carty was extradited from his home country and has now spent nine months in a foreign detention center, far from his family and loved ones. That experience alone has impressed upon him the seriousness of the offense and the respect due to the laws of this country. He will not receive any treatment or education while serving his sentence. And Mr. Carty will not have any ability to make payments on restitution until he is back home in Jamaica.

A sentence of twelve months and one day is also in line with sentences imposed in similar cases in this district

- *United States v. Parks*, CR24-175-RAJ – sentenced to 18 months

MR. CARTY'S SENTENCING MEMORANDUM
(*United States v. Carty*, No. CR24-5250 ) - 8

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Mr. Parks was an attorney and became the trustee for a living trust containing about $1.66 million designed to pay the victim's expenses after she was severely injured as a passenger on a motorcycle. Mr. Parks transferred more than $880,000 from the victim's accounts into accounts he controlled, and paid himself at least $530,000 more than he was entitled to receive for his work as trustee. The victim was left with $15 and was forced to sell her home. The government requested a sentence of 33 months.

- *United States v. Davie*, CR22-5189 BHS – 18 months' incarceration[16]

Mr. Davie was a bank manager and stole $1,279,840 from 8 victims, specifically targeting elderly and vulnerable customers. Dkt. 54 at 2. Three victims had some form of dementia, two struggled with English, and one couldn't read or write. *Id*. He pled guilty to bank fraud. The government recommended 24 months' incarceration.

A sentence of 12 months and one day accounts for the additional time and conditions under which Mr. Carty will serve his sentence, solely on account of his nationality.

## IV.   CONCLUSION

Mr. Carty respectfully requests the Court sentence him to twelve months and one day, with no term of supervised release to follow.

DATED this 11th day of May 2026.

Respectfully submitted,

s/ *Heather Carroll*
Assistant Federal Public Defender
Attorney for Roshard Carty

---

[16] The 18 months' incarceration is for bank fraud. Mr. Davies received an additional 24 months' incarceration for aggravated identity theft, under 18 U.S.C. § 1028A, which carries a mandatory 24-month sentence. Section 1028A(b)(3) forbids courts from considering the mandatory 24 months when sentencing defendants on other counts. Thus, the 18 months on bank fraud is independent of the mandatory sentence.

MR. CARTY'S SENTENCING MEMORANDUM
(*United States v. Carty* , No. CR24-5250 ) - 9

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**